IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **HERBERT L. WASHINGTON**, <br> *Plaintiff*, <br> v. <br> **MCDONALD'S USA, LLC &** <br> **MCDONALD'S CORPORATION**, <br> *Defendants*. | |
| **COMPLAINT WITH JURY DEMAND** | |

**NATURE OF ACTION**

1.    Plaintiff Herbert L. Washington brings this civil-rights action to hold McDonald's, the world's largest franchisor, accountable for its racial discrimination and retaliation against him as a Black franchisee.

2.    In his four decades in the McDonald's system, Mr. Washington has suffered deplorable treatment as compared with White franchisees. As but one example discussed below, McDonald's purposefully steered Mr. Washington into stores in distressed, predominantly Black neighborhoods, which—as McDonald's well knew— yield considerably less profit than stores in more affluent communities.

3.    When Mr. Washington spoke up for himself and other Black franchisees, McDonald's told him to sit down and be quiet. McDonald's then discriminated further against Mr. Washington for daring to stand up for himself and to challenge McDonald's racial discrimination.

4.    McDonald's acknowledged its discriminatory racial-steering policy decades ago and promised to ensure parity for its Black franchisees. Black franchisees like Mr.

Washington relied on these promises from McDonald's in deciding to remain in the system and continue to operate their restaurants. But the discriminatory policies did not cease, and the promised parity remains unfulfilled. Indeed, from the time McDonald's admitted its discriminatory racial steering policy, the profitability gap between White and Black franchisees has grown and Black franchise ownership has plummeted.

5.     In addition to redlining Black franchisees into largely low-volume stores in impoverished communities, McDonald's has consistently discriminated against Black franchisees. Black owners average around $700,000 less in annual sales per store than White owners. This is not a coincidence. Nor is it because Black franchisees are comparatively worse at running businesses. The precipitous decline in Black franchisees and persistent disparity in cash flow are the direct and proximate result of McDonald's ongoing policies of racially disparate treatment.

6.     Black franchise ownership was already in decline when Steven Easterbrook and Chris Kempczinski entered senior leadership as the presidents and CEOs of Defendants McDonald's Corporation and McDonald's USA, LLC, respectively. Mr. Easterbrook took over when Don Thompson retired in 2015. Mr. Kempczinski assumed the position when Mike Andres retired in 2016. These new executives' hostility toward Black individuals in positions of power and authority was clear to those in the C-suite immediately. And that hostility trickled down through the organization to the field offices. Since Easterbrook and Kempczinski took the reins, there has not been a single Black executive in the Columbus field office, the regional

office with authority over Mr. Washington's operation. The Easterbrook-Kempczinski regime intensified the push to reduce Black franchise ownership, resulting in the all-time low that exists today.

7.      While McDonald's has joined the chorus of brands releasing hollow solidarity statements in support of Black Lives Matter and has launched a marketing campaign to profit from that movement, it has done nothing to change its own internal policies that perpetuate systemic racism by disadvantaging and squeezing out its Black franchise owners.

8.      Just a few years ago, Mr. Washington was McDonald's largest Black franchisee in the nation. As part of its effort to reduce Black ownership in its system, McDonald's targeted Mr. Washington for unfair grading and assessments designed to render him ineligible to continue to operate his restaurants. It did so to force him to sell numerous stores to White franchisees. McDonald's coupled these efforts with demands for him to make massive capital investments into the same restaurants it was working to take from him: expenditures that would inure to the benefit of the White franchisees in whose hands McDonald's would approve his stores to land. Each of the restaurants McDonald's forced Mr. Washington to sell has been transferred to a White franchisee. McDonald's created the disparities between White and Black franchisees and is now manipulating those disparities to drive Black franchisees, including Mr. Washington, from the McDonald's system and create the illusion of parity in earnings.

9.      When Mr. Washington protested the discriminatory treatment he was enduring—telling McDonald's **"I am not a house negro and will not be treated**

**like one"**—McDonald's intensified its campaign to drive him from its system in retaliation for his opposition to the discrimination.

10.     One store at a time, McDonald's continues to deprive Mr. Washington of the fruits of his lifetime of labor. He brings this action to end the unequal treatment, stop the retaliation, and recover damages for the discrimination he has endured.

## PARTIES

11.     Plaintiff Herbert L. Washington is a resident of Mahoning County, Ohio. He is Black.

12.     Defendant McDonald's Corporation is a publicly traded Delaware corporation. Its wholly owned subsidiary, Defendant McDonald's USA, LLC, is a Delaware limited liability company that is the franchisor of McDonald's restaurants in the United States. In recognition of the fact that they essentially function as a single entity for present purposes, they are referred to collectively as "McDonald's" throughout this complaint. Their principal place of business is in Illinois.

## JURISDICTION & VENUE

13.     Jurisdiction is asserted under 28 U.S.C. § 1343(a)(4) because this action seeks to recover damages and secure equitable relief under an act of Congress providing for the protection of civil rights. Jurisdiction also exists under 28 U.S.C. § 1331, as well as 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000 (exclusive of interest and costs). Jurisdiction over state-law claims is asserted under 28 U.S.C. § 1367.

14.     The Court has personal jurisdiction over Defendants and venue is proper here under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions

giving rise to the claims occurred in this district and most of the property that is the subject of the action is situated here.

### FACTUAL BACKGROUND

15.    Plaintiff Herbert L. Washington has been a McDonald's franchisee for 40 years. He was born in 1951 in Mississippi. He grew up in Flint, Michigan, where his parents were union automotive workers.

16.    Before becoming a McDonald's franchisee, Mr. Washington was a world-class athlete. He attended Michigan State University on a track scholarship. He was a four-time All-American, won seven Big Ten Titles and an NCAA championship, and narrowly missed the 1972 Olympic track team.

17.    In 1972, Mr. Washington participated in a protest at a Michigan State men's basketball game over the lack of Black coaches and officials in the Big Ten. As a scholarship athlete, it was a huge risk for Mr. Washington to take. But he believed then, as he believes now, in standing up to injustice. The following season, Tom Rucker became the first Black men's basketball official in the Big Ten. Five decades later, there is just one Black men's basketball head coach in the entire conference (Juwan Howard, at the University of Michigan).

18.    After graduating from Michigan State, Mr. Washington played for the Oakland Athletics professional baseball team from 1974–75. Four years later, he became a McDonald's franchisee. Since then, he has been the victim of McDonald's predatory, racially biased steering practices and other disparate treatment, as well as retaliation for his opposition to the discrimination Black franchisees have long endured in the McDonald's system.

**The unequal power balance in the franchisor-franchisee relationship**

19.    McDonald's is the world's largest franchisor and one of the largest owners of commercial real estate on the planet. While it owns and operates certain of its restaurants through its wholly owned subsidiary, McOpCo, most stores are owned by individual franchisees. McDonald's business model consists of charging fees to franchisees for the right to operate a restaurant, typically on land and in buildings owned by McDonald's and leased by franchisees.

20.    When franchisees buy into the McDonald's system, they become captive tenants, under a 20-year franchise agreement with McDonald's. An example of the standard franchise agreement and operator's lease is attached as Exhibit 1. Mr. Washington has signed many such contracts with McDonald's in the past 40 years. In each of those contracts, McDonald's had far greater bargaining power than Mr. Washington.

21.    Per the franchise agreements, the franchisee pays initial fees to McDonald's for the right to operate a McDonald's restaurant at that location for a 20-year period. At the end of the 20-year term, the lease must be renewed for the franchisee to continue operating the store. There are minimum monthly base rent payments, in addition to rent payments calculated based on a percentage of gross sales revenue. Those percentages vary from store to store and are in McDonald's sole control to adjust. McDonald's grants rent relief to the franchisees it chooses and denies it to others (disproportionately assisting White franchisees and refusing similar requests from Black franchisees). There are monthly services fees, contributions for collective

advertising, and other fees and royalties similarly calculated based on percentages of gross sales revenue.

22.     Franchisees are responsible for all operational costs, including insurance, maintenance, security, and property taxes. Franchisees must purchase corporate-supplied or approved equipment and food; submit to site inspections and monitoring; and follow McDonald's policies for training, accounting, human resources, and all other aspects of operation. Franchisees must also perform improvements, renovations, and rebuilds as directed by McDonald's and on the timetables McDonald's sets. These costly reinvestments are required at the sole expense of the franchisee.

23.     Owning multiple stores is the key to success in the McDonald's system. It allows a franchisee to maintain sufficient cash flow across all stores to weather unexpected expenses at any one location and to make customary investments in facilities and equipment. Owning many stores also allows franchisees to absorb the financial impact of McDonald's initiatives and mandates, from offering certain products to overhauling the entire physical appearance of the store.

24.     Under the standard franchise agreement, McDonald's agrees to make available to all franchisees the additional services, facilities, rights, and privileges relating to the operation of a restaurant that McDonald's makes generally available to all its franchisees. Whereas McDonald's fulfilled that obligation to its White franchisees, it violated this provision as to Mr. Washington due to his race.

25.     The franchisor-franchisee relationship is not an equal one. McDonald's tightly controls who may enter its system, which store(s) they may purchase, and how they must operate.

26.     McDonald's wields its extreme power to keep franchisees compliant.

27.     McDonald's alone determines whether franchisees are eligible for growth (whether they can acquire new stores) and rewrite (whether they will be granted a new lease to continue operating their existing stores when their 20-year terms expire). Eligibility for growth and renewal depends on the business reviews that McDonald's conducts of a franchisee's organization. At the term's conclusion, McDonald's maintains the discretion to enter a new lease with the franchisee, select a different franchisee, or close the store. Franchisees must strictly adhere to McDonald's dictates or risk being deemed ineligible and losing everything.

28.     Under McDonald's rewrite policy, the process begins three years before the franchise term expires. McDonald's exercises complete and unfettered discretion to unilaterally deny a franchisee a renewed franchise term through a variety of subjective metrics (such as whether a franchisee has a good attitude or is cooperative). These assessments are conducted by the local field office as part of bi-annual business reviews of a franchisee's organization.

29.     The local field office makes recommendations to the Rewrite Committee, which—on information and belief—are almost always followed. The Rewrite Committee's decisions are final. If the committee denies a rewrite, the franchisee has no recourse. The franchisee must sell the store, inevitably at a loss, if McDonald's will

approve someone to buy it. McDonald's dictates to whom such a sale can be made and on what terms. Franchisees have no opportunity to sell their restaurants on the open market to ascertain fair market value. McDonald's fully controls the exiting process.

30. Even through the exiting process, McDonald's exercises various tactics to manipulate franchisees such as cutting sales volume by encroaching on their territory or altering advertising to skew against a franchisee's customer base. Such tactics depress resale value as they are being forced out. Franchisees must comply with McDonald's directives or risk financial ruin.

**McDonald's longstanding and demonstrable policy of discrimination**

31. When the McDonald's franchise system was established in 1955, its restaurants were located only in White neighborhoods and owned exclusively by White franchisees. McDonald's permitted its franchisees to enforce segregation in its restaurants and even to take legal action against the NAACP and the Student Non-Violent Coordinating Committee when they protested this discrimination.

32. During the 1960s, White flight to the suburbs led to changing neighborhood demographics, with McDonald's locations once in predominantly White neighborhoods now located in predominantly Black ones.

33. In the wake of the assassination of Dr. Martin Luther King, Jr., in April 1968, and the civil unrest that followed over that summer, McDonald's finally opened its franchising operations to some Black entrepreneurs. Herman Petty became the first Black owner-operator of a McDonald's, on December 21, 1968. His store was in inner-city Chicago. Four years later, Mr. Petty co-founded the National Black McDonald's Operators Association (NBMOA).

34.     But the admission of Black franchisees into the McDonald's system was not on equal terms with White franchisees. McDonald's began the practice of so-called "zebra" or "salt-and-pepper" partnerships in predominantly Black neighborhoods. In these "partnerships," Black co-owners were figureheads who managed a store's day-to-day operations while White investors reaped profits as silent partners.

35.     In Cleveland, local Black businessman Ernest Hilliard wanted to purchase a McDonald's franchise. He made a deal with Orville Benson, a White McDonald's franchisee, to purchase a store Mr. Benson owned on Cleveland's East Side. But McDonald's refused to approve the deal. Community leaders met with McDonald's to urge approval. Just before a second meeting with McDonald's leadership was scheduled to take place, Mr. Hilliard was murdered in front of his Warrensville Heights home. His murder remains unsolved.

36.     After Mr. Hilliard's murder, Operation Black Unity—a coalition of local churches and civil-rights groups co-chaired by Reverend Donald S. Jacobs, Reverend Jonathan Ealy, and William O. Walker—led a boycott of four White-owned McDonald's restaurants in predominantly Black neighborhoods on Cleveland's East Side for more than a month in the summer of 1969. The boycott led to the four stores—at 13705 Euclid Avenue, 10411 St. Clair Avenue, 14235 Kinsman, and 9101 Kinsman—temporarily closing for a month as the NAACP, the Urban League, and the Southern Christian Leadership Conference supported the effort.

37.     Negotiations throughout the summer were unsuccessful. Even as White franchisees expressed their willingness to sell, McDonald's would not relent.

Cleveland Mayor Carl Stokes—the nation's first Black mayor of a major city—stepped in to mediate and finally convinced McDonald's to agree to permit Black ownership at those four stores.

38.     Unable to continue restricting franchise ownership to Whites, McDonald's began targeted marketing campaigns in the Black community and enticed Black entrepreneurs into its system as part of a growth strategy designed to expand its customer base and prey on aspiring businessowners. McDonald's steered Black would-be franchisees into Black neighborhoods with low-volume sales and disproportionately high overhead costs. This discriminatory company policy allowed McDonald's to capitalize on the lower real-estate prices in disadvantaged areas and increase sales in the Black community, while shifting the costs and risks to Black franchisees relegated to those urban areas. The stores McDonald's approves Black franchisees to own require consistently higher proportional investment of time, effort, and money to operate given the myriad challenges of successfully operating a business is communities with high crime and poverty rates.

39.     These underperforming stores to which McDonald's limited Black franchisees were often the oldest stores in the geographic area and in need of substantial reinvestment. McDonald's demanded that the reinvestment be completed on a swift timetable despite knowing that the franchisees would not reap the return on such investments. White entrepreneurs were customarily offered newer and safer stores with higher volume than the stores McDonald's permitted Black entrepreneurs to acquire.

40.    In addition to redlining Black franchisees into low-volume stores in predominantly Black communities, McDonald's has consistently discriminated against Black franchisees in other respects—treating them differently from White franchisees. Some examples include: denying reasonable requests for financial assistance (such as permanent rent relief) and restructuring plans for Black franchisees to remedy the injuries caused by relegating them to substandard locations; denying impact relief and other financial support; targeting Black franchisees for harsh and unreasonable site inspections as a means of harassing and pressuring Black franchisees to exit the system (particularly if they objected to the endless discrimination they endured). Harshly evaluating a franchisee's performance at a store in a disadvantaged community is particularly unfair given the inherent challenges faced by all business owners in poor communities. White franchisees did not endure this treatment.

41.    McDonald's does not welcome criticism of its racially biased policies or the unfair outcomes they cause. McDonald's uses its renewal power as a tool to stifle dissent and continue its discriminatory treatment of Black franchisees. That power— to deprive a franchisee of not only the right to do business going forward but to leverage total forfeiture of a franchisee's investment of time and resources— facilitates discrimination in perpetuity. Most Black franchisees were and remain afraid to publicly object to the ongoing disparate treatment they endure.

42.    Some Black franchisees nonetheless have publicly objected to McDonald's racist steering and otherwise discriminatory policies. In 1983, McDonald's sued a

Black franchisee in Los Angeles, Charles Griffis, claiming that he was in violation of his franchise agreement because his wife operated a Popeye's Fried Chicken. Mr. Griffis countersued McDonald's for race discrimination, alleging he had been steered into "hellholes" and denied the chance to purchase a store in a "good neighborhood." McDonald's general counsel publicly characterized Mr. Griffis's race-discrimination claims as "bogus," but the company nevertheless paid him $4.7 million to settle the dispute.

43.     Unlike Mr. Griffis, most Black franchisees were fearful of publicly calling out McDonald's for its racist steering practices and other discriminatory treatment. They advocated for fairness through the NBMOA. In the years following the Griffis lawsuit, the NBMOA continuously objected to the fact that McDonald's confined Black franchisees to poor neighborhoods and did not permit them to expand on equal terms with their White counterparts.

44.     In 1996, McDonald's admitted its policy of racial steering, with Executive Vice President Thomas S. Dentice writing to the NBMOA: "for business reasons we thought valid at the time, the Company has placed many Black Franchisees in restaurants that have not allowed them to achieve the same level of economic success as their peers." He promised to "create and implement a strategy designed to achieve parity for African American franchisees."

45.     The NBMOA continued to advocate for the promised parity in the coming years. Mr. Washington was deeply involved in that effort as the NBMOA's vice

president and a board member working to obtain commitments from McDonald's to level the playing field for Black and White owners.

46.    McDonald's continued to lead the NBMOA and its members to believe that McDonald's was committed to remedying the discriminatory practices of the past and ensuring that they did not continue. Mr. Washington reasonably relied on McDonald's promises to achieve parity for Black franchisees. But McDonald's promises of parity turned out to be empty. McDonald's never ceased the disparate treatment that continues to injure Black franchisees. During the decade after McDonald's promised to achieve parity, Black franchise ownership plummeted. That trend did not abate despite having a Black chief executive, Don Thompson, for three years (2012–15). And the mass exodus of Black owners accelerated when Steven Easterbrook replaced Mr. Thompson in 2015.

47.    The Easterbrook administration took the McDonald's enterprise from bad to worse in terms of intentional race discrimination. Mr. Easterbrook and his right-hand man, McDonald's USA president and CEO Chris Kempczinski, continued the past practices of denying Black franchisees equal opportunities for growth and renewal, rejecting requests for equal rent relief, and confining Black franchisees to low-volume stores in predominantly Black neighborhoods. They also implemented remodeling initiatives that were designed to force Black franchisees out of the McDonald's system.

48.    McDonald's implemented these remodeling initiatives in a manner designed to make it impossible for Black franchisees to comply on McDonald's unreasonable

timetables, given that they were generally confined to low-volume stores without the cash flow for mandated capital investments. Through these intentional policies and practices, Mr. Easterbrook and Mr. Kempczinski successfully tripled the cash-flow gap between Black and White franchisees and continued the trend of driving Black owners out while insisting that they pour cash into bad locations. These initiatives were a pretext for forcing Black franchisees out of the system—particularly long-term franchisees like Mr. Washington, who managed through his hard work to achieve and maintain liquidity despite the acknowledged lack of parity over his career—for the benefit of the predominantly White franchisees who would scoop up the stores as Black franchisees were squeezed out by design. Having steered Black franchisees to older restaurants, McDonald's knew it would be more difficult (if not impossible) for them to meet McDonald's remodeling demands than it would be for the White franchisees selected for safer and more profitable locations. Had McDonald's allowed Black franchisees to grow and expand on equal terms with its White franchisees, Mr. Washington would have been in an equal position to absorb the costs of these initiatives.

49.    Mr. Easterbrook and Mr. Kempczinski also reversed the trend of the Black community being overrepresented in the McDonald's customer base by decreasing the advertising designed to attract Black patrons. As a result, the low-volume stores in predominantly Black neighborhoods to which so many Black franchisees had been relegated saw further decrease in their revenues *by design*.

50.    McDonald's disparate treatment of Black personnel permeated the C-suite. Accomplished Black senior executives internally opposed these racist policies under the Easterbrook-Kempczinski regime and suffered swift retaliation. During the Easterbrook-Kempczinski years, McDonald's reduced its total Black officers (vice president or higher) from 42 to 7. This was not a coincidence. The local field offices took their cues from the top brass and relations deteriorated with Black franchisees.

51.    As increasing hostility within the McDonald's organization permeated from the top down, the NBMOA continued to advocate internally for Black franchisees. In a March 12, 2019 letter, the NMBOA complained about the "hostile" treatment of Black franchisees and how it was negatively impacting sales in the Black community.

52.    On November 3, 2019, McDonald's board of directors fired Mr. Easterbrook. He was not fired for implementing a racist agenda but because he "demonstrated poor judgment involving a recent consensual relationship with an employee." More specifically, McDonald's claimed he engaged in inappropriate sexual relationships with subordinates, lied about some of those relationships, and destroyed evidence of those liaisons.

53.    After Mr. Easterbrook was fired, his hand-picked successor, Mr. Kempczinski, assumed the role of president and CEO of McDonald's Corporation. Nothing changed in terms of McDonald's disparate treatment of Black franchisees. The NBMOA continued to advocate for an end to McDonald's ongoing race discrimination against Black franchisees. And McDonald's continued to promise to solve the problem of rampant disparity, inducing Mr. Washington and other Black franchisees to continue

to operate within McDonald's intentionally discriminatory system. Such promises remain unfulfilled as, one by one, Black franchisees are pushed out of the McDonald's system and those remaining continue to earn vastly less than White franchisees because of McDonald's longstanding and demonstrable disparate treatment of Black franchisees.

### McDonald's racially discriminatory corporate policies continue to inflict injuries on Black franchisees, driving many from the system entirely.

54. For decades, McDonald's has profited from its policy of steering Black franchisees into low-volume stores. Black franchisees like Mr. Washington are required to work harder and bear greater operational costs for less profit than their White counterparts who were not relegated to underperforming markets based on their race.

55. McDonald's fees and profits are based on gross—not net—revenues. The operational costs of a specific store do not impact McDonald's revenue stream. By design, the gross sales on which the percentage payments under the franchise agreements are based do not account for the higher cost to operate restaurants in areas where insurance costs, security costs, and employee-turnover costs are consistently higher. By relegating Black owners to the oldest stores in the toughest neighborhoods, McDonald's ensured that Black franchisees would never achieve the levels of success that White franchisees could expect. Black franchisees must spend more to operate their stores while White franchisees get to realize the full benefit of their labors. Because the percentages McDonald's charges franchisees are calculated based on gross sales, McDonald's revenues are not affected by how much more Black

franchisees must spend to run the stores McDonald's has allowed them to purchase. Black franchisees must work harder to earn less, and thus subsidize everyone else's profits by contributing a disproportionately greater share of their revenues to McDonald's. McDonald's artificially capped Black franchisees' opportunity to profit from their work and kept them operating at lower profit margins than White franchisees.

56. Many Black franchisees failed to overcome the disadvantages inherent in underperforming stores. They were forced out of the system, with McDonald's retaining the properties—and the improvements the Black franchisees had paid for—without compensation.

57. For Black franchisees who were able to successfully operate low-volume stores at a profit, the Easterbrook-Kempczinski mandate to quickly modernize stores forced them to take on increasing debt, which was unsustainable given the growing cash-flow gap. Most White franchisees who sought more time to complete these required renovations were accommodated, while most Black franchisees were not. McDonald's used the failure to complete these remodels as an excuse to deem Black franchisees ineligible for expansion and renewal. And for the Black franchisees who did acquiesce to McDonald's demands to pour financial resources into substandard locations, including through the recent remodeling projects, their compliance triggered economic duress that resulted in McDonald's being able to cycle them out of the system at a lower buy-back price.

58.    McDonald's allocated resources in a discriminatory manner to favor White franchisees. Examples include granting White owners permanent rent relief, impact funding, more time to complete massive renovation projects, and more meaningful financial support to overcome hardships, while denying the same to Black franchisees.

59.    During the decades it has been profiting from its intentional race discrimination against Black franchisees, McDonald's worked to position itself publicly as a friend of the Black community and targeted Black Americans with advertising campaigns featuring Black icons. These efforts were tailored not only to convince Black patrons that McDonald's valued racial diversity, but to encourage Black franchisees to remain in the system to cater to this customer demographic.

60.    McDonald's efforts to rehabilitate its image in the Black community continue. In the wake of George Floyd's murder and Black Lives Matter protests in the summer of 2020, McDonald's sought to portray that it stood in solidarity with the protesters and with victims of police violence.

61.    Yet McDonald's has never treated its Black and White franchisees equally. It has systematically and intentionally steered Black franchisees into high-crime areas riddled with poverty while making more profitable locations available to White franchisees. McDonald's claimed to care about injustice, but it kept unjust policies in place while stringing Black franchisees along with promises of parity. McDonald's offered a publicly-facing anti-racist message, but its race-based steering policies hamstrung Black franchisees and prevented them from ever achieving equality with

their White counterparts. Those policies and practices continue to injure Black franchisees to this day as they struggle to remain viable businessowners in the face of McDonald's unreasonable demands. Now McDonald's is driving Black franchisees from its system by exploiting the very inequalities its longstanding discriminatory practices have caused.

62. In 1998, there were 377 Black franchisees in the McDonald's system. Now there are 186. During that same time frame, its total number of stores has more than doubled, from 15,086 to 38,999. These numbers are not a coincidence; they are the result of McDonald's intentionally racist policies and practices toward Black franchisees.

63. Between 2010 and 2019, NBMOA data show that the cash-flow gap between White and Black franchisees has more than tripled. Black owners average around $700,000 less in annual sales per store than White owners. This, too, is not a coincidence. Nor is it because Black franchisees are comparatively worse at running businesses. The precipitous decline in Black franchisees and persistent disparity in cash flow are the direct and proximate result of McDonald's intentional racist conduct.

64. In response to persistent objections from Black franchisees about the worsening cash-flow gap, McDonald's sought to manipulate the numbers proving the disparity by forcing Black franchisees to sell low-volume stores to White franchisees. This deprives Black franchisees of their stores to create the illusion of parity. Even low-volume stores are profitable, so McDonald's efforts to narrow the cash-flow gap

on paper by singling out Black franchisees to divest them of stores is racially disparate treatment that inures to the benefit of White franchisees.

65.    As McDonald's has systematically eliminated Black franchisees from its operations, it has ensured that those stores go to White owners. McDonald's carefully curates its approved list of buyers. McDonald's restricts those opportunities and carefully controls transfers and sales. As a result, the demographics of the current franchisee population are exactly what McDonald's intentionally selected.

66.    Mr. Washington was among the most successful Black franchisees in the McDonald's system. He has managed to achieve success despite McDonald's longstanding history of racial discrimination. But now he, too, is marked for extinction, in part because of McDonald's historic and ongoing discrimination against all Black franchisees and in part because Mr. Washington opposed the discrimination he faced, resulting in McDonald's retaliation.

### Mr. Washington's history as a McDonald's franchisee

67.    Mr. Washington became a McDonald's franchisee in 1980, at the age of 29. His first store was in inner-city Rochester, New York. It was next to a housing project called Fight Square.

68.    Mr. Washington spent most of his life in Michigan and had no prior connection to Rochester. McDonald's steered him to this store in a distressed, predominantly Black neighborhood, giving him no other option to enter the McDonald's system.

69.    Six months later, McDonald's steered Mr. Washington into another inner-city store in Rochester. It was next to a housing project called Fight Village.

70.     Mr. Washington developed a track record of succeeding in these difficult stores. He wanted to grow to include more stores. He saw White franchisees in the Rochester area granted a new store each year by McDonald's. But for years McDonald's limited him to just two. It was not until the mid-1980s that McDonald's approved his acquisition of a third store.

71.     Mr. Washington wanted to continue to grow. In the early 1990s, stores became available in suburban areas of Rochester, including Dansville and Geneva. Mr. Washington struck a deal with the White owner to purchase the suburban stores. But McDonald's blocked the sale, exercising its right of first refusal to purchase the stores and selling them to a White owner rather than to Mr. Washington. It would not be the last time McDonald's chose to steer an available store to a White franchisee to Mr. Washington's detriment. The field-office executive who blocked the sale, Mr. Andres, went on to become president of McDonald's USA.

72.     Mr. Washington was recognized as a strong and engaged community leader in the Rochester area. He was appointed chairman of the board of the Buffalo Federal Reserve Bank and later was appointed to the New York branch of the Federal Reserve Bank.

73.     Mr. Washington remained successful in the few stores McDonald's had allowed him to purchase. He continued to want to increase the number of his franchise stores. But after 20 years in Rochester, he had just five stores. White owners operating successfully for that same amount of time had more stores than he did. He began

looking for opportunities to purchase a package of stores that would allow him to build his business and leave an enduring legacy for his family.

74.     In the late 1990s, Sam Covelli was one of the largest franchisees of McDonald's restaurants, owning 50 restaurants in Ohio and Pennsylvania. But Covelli Enterprises had started franchising Panera Bread restaurants—a competing business and in direct violation of the standard McDonald's noncompete clause in every franchise agreement. Rather than sue Mr. Covelli for violating the noncompete—as it did when Mr. Griffis's wife franchised a Popeye's Chicken Restaurant in 1983—McDonald's instead helped Mr. Covelli secure top dollar for his McDonald's stores from Mr. Washington.

75.     In 1998, Mr. Washington sold his stores in New York and purchased 19 stores from Mr. Covelli's in the greater Youngstown area. He purchased another six stores from Mr. Covelli six months later. Mr. Washington became the largest Black franchise owner in the nation.

76.     But the transition to Ohio was rocky. Covelli Enterprises began pirating managers and employees from Mr. Washington's new stores in violation of the purchase agreements. The dispute dragged on for 15 years with the arbitrator ruling in Mr. Washington's favor. McDonald's offered Mr. Washington no support or assistance as he battled to succeed while Covelli Enterprises hired away the star talent from his stores to work at Panera. A White franchisee facing the same unfair competition and unlawful solicitation of employees would have received assistance from McDonald's in the form of rent relief or other financial support (such as

assistance with necessary repairs to stores that Mr. Covelli had sold him). Yet McDonald's denied that support to Mr. Washington because of his race.

77.    Mr. Washington devoted his time not only to developing his own stores but to corporate affairs. He served as an operator's advocate in cases in the corporate ombudsman's office. He traveled to different regions to meet with operators to help improve their operations. He spoke at the McDonald's worldwide convention and served on the planning committee.

78.    Despite the success Mr. Washington had achieved and his contributions to the corporate enterprise, he had not been allowed to expand his organization as he wished. Given McDonald's continuing inclination to limit the growth and expansion of Black franchisees in suburban markets, he began to expand into the Cleveland area, purchasing three stores on the City's East Side in 2007. The field office vice president at the time, Shirley Rogers-Reece, specifically asked him to purchase these stores because the previous owner was having problems. McDonald's raised the rents immediately when he took over. When he protested, McDonald's said he could run low volumes better than anyone and didn't need help. Mr. Washington consistently had less revenue per store than the national averages because McDonald's pigeonholed him in this way because of his race. McDonald's expected Mr. Washington to be content to earn only what McDonald's was willing to allow, which was perpetually a lower percentage than McDonald's was willing to let White franchisees earn.

79.    Mr. Washington continued to expand his organization in the Cleveland area, acquiring more stores over the next several years in the inner-city neighborhoods where McDonald's would approve him to acquire stores. These stores were predominantly older stores in Black neighborhoods with low-volume sales.

80.    In approximately 2011, Mr. Washington was awarded a store in the East Side suburb of University Heights. The store was near the site of a new shopping center, including a Whole Foods. According to 2010 Census data, the community is approximately 70% White. Mr. Washington had finalized the deal—and had selected the equipment and décor package for the store—when McDonald's abruptly intervened and awarded the store to a White operator, Dave Stiles.

81.    Mr. Washington complained to McDonald's chief operating officer that Mr. Stiles was a racist. The COO responded: "I know." But the company allowed Mr. Stiles to expand his organization in the suburbs while keeping Mr. Washington out.

82.    Nor did the company act when Mr. Washington protested to McDonald's that all Black-owned stores were segregated on the City's East Side (and not in the suburban areas). He repeatedly identified this continued limitation on Black ownership as "redlining" in complaints to McDonald's personnel. He wanted to be permitted to purchase higher-volume stores in safer communities as his White colleagues were permitted to do. But McDonald's refused to allow him to purchase a store on Cleveland's West Side. He complained to numerous McDonald's executives that he had been on the front lines running low-volume stores for decades and

deserved to acquire some better stores. McDonald's never permitted Mr. Washington to purchase a West Side store on account of his race.

83.     After the Easterbrook-Kempczinski regime opted to reduce advertising to the Black community, Mr. Washington repeatedly objected that the collective advertising—which he was expected to regularly contribute a percentage of his gross sales toward nationally and locally—was not reaching his customer base. He was ignored. The franchise agreements precluded him from using advertising or promotional materials or programs not provided or approved by McDonald's. In other words, he had no recourse for the company's decision to stop advertising to a large swath of his customer base, and the resulting impact on his sales.

84.     He was also denied requested resources for "activations"—efforts to initiate customer patronage—in the Black community. McDonald's discontinued a program that allowed Black teenagers to visit Historically Black Colleges and Universities (HBCU) over Mr. Washington's objection.

85.     Mr. Washington continued to complain—including directly to the then-president of McDonald's USA Mike Andres—that inner-city stores were losing value while suburban store value continued to rise. McDonald's chose not to take action in response to this significant problem that was entirely of McDonald's making. When Mr. Washington complained about how Black franchisees' stores were being graded unfairly within a corporate franchising committee, he was quickly removed from the committee.

86.     In 2018, Mr. Washington and other Black franchisees in Ohio complained about McDonald's racial discrimination toward Black franchisees, objecting that McDonald's was not permitting the children of Black franchisees to enter the McDonald's system on equal terms with the children of White franchisees through McDonald's Next Generation Training Program. McDonald's touts the NextGen program as a way for franchisees "to bring their qualified family members into the business, to build their own McDonald's legacy." When Mr. Washington complained about the preferential treatment being given to White franchisees' children in the NextGen program, then-field-office vice president, Gregg Ereio, told Mr. Washington and the other Black franchisees at the meeting: "If you want your kid to get a restaurant, you should sell him one of yours," or words to that effect. Mr. Ereio's message was clear: McDonald's would not allow Black franchisees' children to enter the McDonald's system on equal terms with the children of White owners.

87.     During an NBMOA meeting in 2018, Mr. Ereio promised that in one year, he would "close the gap" between Black and White operators in terms of cash flow. (McDonald's has acknowledged that this cash-flow gap is approximately $700,000 annually per store.) The plan, apparently, was to force the transfer of low-volume stores from Black franchisees to White franchisees to create the appearance of relative equity in revenue. But all this scheme has done is redistribute wealth from Black franchisees to White owners.

88.     Mr. Washington remained in the McDonald's system because McDonald's continued to promise that it would end its history of discrimination and achieve

parity. He reasonably believed that once parity was achieved, the revenue and profitability numbers McDonald's touts would finally be obtainable for him. While he has been waiting for fair and equal treatment, McDonald's has enjoyed a steady stream of rent and fees from Mr. Washington's efforts and success under racially discriminatory circumstances. Now, McDonald's is working to dismantle his life's work to create the illusion of parity in cash flow between White and Black franchisees. And it is targeting Mr. Washington because of his opposition to the relentless discrimination he has endured in the McDonald's system.

### McDonald's begins pushing Mr. Washington out as part of its effort to reduce Black ownership in the McDonald's system and in retaliation for his opposition to discrimination.

89.     Today, Mr. Washington owns 14 McDonald's restaurants: six in Mahoning County, one in Trumbull County, three in Cuyahoga County, and four in Mercer County. This is down from 23 restaurants in 2017, when McDonald's began its campaign to drive Mr. Washington from its system and deprive him of his life's work.

90.     Until October 2017, Mr. Washington was rated as eligible for growth and rewrite. Being eligible for growth and rewrite meant that he could continue to expand within the McDonald's system. He hoped to acquire some higher-volume stores to offset the astronomical costs of the remodeling initiatives that McDonald's was rolling out in the Easterbrook-Kempczinski administration.

91.     But in October 2017, McDonald's suddenly announced that Mr. Washington was no longer eligible for growth and rewrite. Nothing had changed about how Mr. Washington ran his stores. He continued to turn a profit in the stores McDonald's

allowed him to own, including a disproportionate share of low-volume stores in poor communities. An experienced franchisee with decades in the McDonald's system did not suddenly become a terrible operator. Consistent with its general practices toward Black franchisees, particularly during the Easterbrook-Kempczinski regime, McDonald's subjected Mr. Washington to targeted and unreasonable inspections and harsh grading to manufacture negative internal business reviews on account of his race, which McDonald's then used as pretext to dismantle Mr. Washington's business.

92.     McDonald's insisted that he divest of his stores in the Youngstown market and consolidate in the Cleveland market, or else be denied rewrite on his stores approaching the end of the 20-year lease. To encourage him to acquiesce to this unwanted downsizing, McDonald's initially proposed that Mr. Washington purchase four company-owned (McOpCo) stores in Wooster, Ohio, which is in the Cleveland TV market. According to 2010 Census data, Wooster is 90% White. At the time, McDonald's was moving away from company ownership of the McOpCo stores, which are typically in prime locations and perform well.

93.     Mr. Washington had no choice but to acquiesce to McDonald's demands, and agreed to downsize and consolidate his operations in the Cleveland TV market. He knew that the revenues from these high-volume Wooster stores would offset the ongoing injuries from the lower-volume restaurants to which McDonald's had largely limited him and make progress toward remedying the historically negative sales and cash-flow gaps he endured as a Black operator. This would have positioned him to better weather McDonald's demands for massive capital investments at all stores.

94.     But in reality, McDonald's had no intention of permitting Mr. Washington to acquire four high-volume stores in a predominantly White community. It subsequently rejected his acquiring the Wooster stores. Nothing had changed since the early 1990s, when McDonald's blocked his efforts to purchase stores in suburban areas.

95.     Despite refusing to let him purchase the Wooster stores, McDonald's continued to insist that Mr. Washington downsize to remain eligible for growth. During a conversation in late November 2017, Dave Garcia (Vice President of Operations and Franchising for the Ohio Region) and Mr. Washington agreed that he would sell ten stores by June 2018 to remain eligible for growth and rewrite. But in follow-up correspondence, McDonald's insisted he complete the sales by March 1, 2018, and gave no assurances about his eligibility.

96.      Mr. Washington remained at McDonald's mercy as it continued to move the goal posts. He should not have been subjected to a requirement to downsize, and only suffered that indignity because he was a Black franchisee and he dared to oppose race discrimination. Anything he proposed that would have led to a fair and equitable solution—where he would have been treated equally with the White franchisees—McDonald's either rejected outright or agreed to and then reneged on. McDonald's was determined to dismantle Mr. Washington's organization due to his race.

97.     McDonald's presented Mr. Washington with approved buyers for his stores it was requiring him to sell. All were White.

98.     At McDonald's insistence, Mr. Washington sold four of his Youngstown-market stores to Tom Locke, a White franchisee. Mr. Washington did not want to sell these stores. He did so only because McDonald's demanded it.

99.     In the meantime, McDonald's harangued him about investing in remodeling projects, *including for stores it was requiring him to sell*. On February 16, 2018, Mr. Garcia wrote to Mr. Washington—two weeks before the deadline to sell the remaining six stores—saying it was "imperative that you review this information and respond quickly with your choice of décor package, as well as with the required deposits, in order to move forward on these projects." McDonald's was demanding that Mr. Washington subsidize his own demise by pouring resources into these properties as they were ripped from his hands.

100.    Despite Mr. Washington's best efforts, he could not find a buyer for the remaining six stores. Two of the locations (on the Ohio Turnpike, where McDonald's had denied Mr. Washington impact-relief sought due to road construction and exit closures on the highway) were set to be closed in May of 2020 because the leases were not being renewed through the Ohio Turnpike Commission, leaving Mr. Washington with four stores to sell per McDonald's then-current demands.

101.    Mr. Washington advised McDonald's of the dearth of interest approved buyers were showing in purchasing the stores it was forcing him to sell. Mr. Washington referenced Turan Strange, a Black operator with three stores in Cleveland who took a year and a half to sell his inner-city stores just two years earlier as he was trying to retire. Mr. Washington said he turned down the opportunity to purchase those

stores because he had enough inner-city stores. He expressed his view that "this is a system wide problem and will need the system to fix. Most people do not want to deal with the stress and danger of running these stores based on low volume." McDonald's was well aware of the unreasonableness of making such demands of Mr. Washington under the circumstances and has never treated a White franchisee similarly.

102.    Mr. Washington was unable to secure an agreement with an approved operator to purchase his stores for a fair price within McDonald's deadlines. As McDonald's continued to pressure him to sell to a White operator (John House) who was not interested in fairly compensating Mr. Washington for the stores, Mr. Washington pushed back, asking why Mr. House would buy Mr. Washington's inner-city stores when Mr. House recently bought three other McDonald's with both higher sales volume and in better communities. Mr. Washington reported communicating with nine potential (McDonald's approved, White) buyers; only two even asked for a price. Mr. Washington reported to McDonald's: "None of the other 7 potential buyers were even interested in visiting my stores in the hood. No owner operator wants low volume stores in the hood." Yet these were the stores to which McDonald's largely confined Mr. Washington.

103.    Mr. Washington also complained that McDonald's tipped off other owner-operators (*i.e.*, the potential buyers for Mr. Washington's stores) that the company wanted him out: he reported to McDonald's that another owner had alerted him that "everyone knows the company wants you to sell or they are going to take away your stores one by one at rewrite." Mr. Washington expressed that, given this information,

it seemed that potential buyers would rather wait him out while McDonald's dwindled his organization to nothing.

104.   Mr. Washington also complained that McDonald's rejected his—but not many White franchisees'—repeated requests for more time to complete the mandated remodeling projects.

105.   McDonald's retaliated, threatening to revoke a rewrite offer that already had been extended for Mr. Washington's Kinsman location and deny him rewrites on the six stores in the upcoming rewrite window if he did not comply with McDonald's demands.

106.   On July 23, 2018, McDonald's, through Mario Barbosa, president of the East Zone (of which the Ohio Region is a part), insisted that Mr. Washington sell four Cleveland stores (Euclid Avenue, Kinsman, Buckeye, and Beacon Place) for $200,000 if he wanted to be eligible for growth and rewrite. Mr. Washington had just acquiesced to McDonald's demand that he invest nearly $400,000 in a remodeling project at the Kinsman store, based on the unequivocal promise that he would recoup that investment. This deal would have allowed a White buyer to scoop up Mr. Washington's stores for less than the cost of the equipment they contained and with the benefit of the costly improvements Mr. Washington had just completed.

107.   In August 2018, Mr. Washington offered to *give* McDonald's or another operator two of the four restaurants it was requiring him to sell (Buckeye and Beacon Place—where the volume was so low that he was operating them at a loss) because no one wanted them. He wrote: "It would be unconscionable for McDonald's to deny

me rewrite on my other restaurants because I could not divest of these unsalable, even for free, restaurants." But McDonald's refused to allow Mr. Washington to give away the two low-volume restaurants and insisted he package them with his profitable stores for sale: "it is necessary for a seller to package higher-valued restaurants with lower-valued restaurants in order to make a multiple-restaurant package appealing to buyers." McDonald's was insisting that Mr. Washington relinquish more profitable stores that he did not want to sell, meaning Mr. Washington's few higher-volume stores in the Cleveland area would be transferred to a White franchisee. McDonald's knew that by stripping Mr. Washington of his few high-volume locations, it was crippling his organization and precluding him from offsetting the losses that McDonald's was forcing on him.

108.   McDonald's then reversed course in 2019, urging Mr. Washington to further downsize his operations and consolidate in the *Youngstown* market instead. Having sold four Youngstown stores to Mr. Locke as part of McDonald's initial demand that he consolidate in the *Cleveland* market, this request was unfair and moved the goal posts yet again. McDonald's was ensuring that a Black franchisee could never own only high-volume restaurants, even after a career of being expected to succeed in low-volume stores. McDonald's held the threat of rewrite denial over Mr. Washington's head if he did not relent to this new demand.

109.   Mr. Washington protested, saying he did not want to sell two of his Cleveland stores, which had higher volume and better cashflow. He again offered to *give away* the two lowest-volume stores (Buckeye and Beacon Place)—with compensation for

equipment only—and to sell four additional stores. McDonald's refused, giving him 60 days to present a signed purchase agreement for the six stores it now demanded that he sell.

110.   Mr. Washington pleaded with McDonald's, saying its latest demand would set him up for failure. He objected to being bullied into selling his most profitable stores. Yet he continued to try to work with McDonald's to meet its ever-changing demands in a way that would give him some security. He agreed to sell four Cleveland stores right away, and then to sell the two highest-volume Cleveland stores after he was rewritten on the Youngstown stores in the rewrite window.

111.   McDonald's responded with a faux acceptance: requiring Mr. Washington to complete the sales all on his own and on a rapid timetable. McDonald's does not ask White franchisees to transact the sales of their properties without assistance. Yet, on account of his race, this is precisely what McDonald's was now demanding that Mr. Washington do, while still not giving him any assurance that it would not further diminish his holdings by demanding even more sales or denying rewrites.

112.   When Mr. Washington objected, McDonald's briefly relented, proposing an offer to purchase three restaurants (Buckeye, Beacon Place, and Kinsman) for $250,000 (up from $200,000) with Mr. Washington to sell the remaining (Euclid Avenue) store unassisted. The three-store package included the Kinsman restaurant where Mr. Washington had just made a large capital investment for required remodeling that McDonald's demanded. But now McDonald's was not offering to permit him to retain his eligibility, but rather to delay his next rewrite decision

(without any assurance that these mandated sales would protect his remaining stores).

113.   McDonald's had promised Mr. Washington that if he invested the $380,000 for remodeling at the Kinsman location, he would expect to recoup that investment. He would never have made that capital expenditure without that promise. He offered to sell McDonald's the three stores for $380,000—essentially giving them away after his recent remodeling investment at Kinsman. And if he was unable to sell the Euclid Avenue store on his own, he proposed McDonald's buy it from him at the low end of fair market value.

114.   McDonald's refused. In a March 22, 2019 letter from Mr. Garcia, McDonald's reverted to its previous demand that Mr. Washington sell all his Cleveland restaurants or face immediate denial of rewrite on his six stores in the window.

115.   Mr. Washington responded opposing his discriminatory mistreatment in no uncertain terms. Sadly (and illegally), McDonald's retaliated against him as a result. He told Mr. Garcia that his March 22 letter "showed the arrogance of a slave master speaking to one of his slaves." Mr. Washington said: "I am not a house negro and will not be treated like one." He expressed his frustration with McDonald's unreasonable position regarding the low-volume stores that no one wanted to buy. Just as McDonald's had always done, McDonald's continued to deny Mr. Washington rent relief or other financial support it customarily offers to White franchisees to mitigate the ongoing losses.

116.   In response, McDonald's escalated its efforts to divest Mr. Washington of his stores. Rather than addressing the underlying concerns, McDonald's took issue with Mr. Washington's statement that he was being treated unfairly because of his race, saying they were "deeply offended" by his accusation. McDonald's insisted that Mr. Washington sell all his Cleveland restaurants, though it agreed to increase the offer for the three restaurants to $380,000 from $250,000, with Mr. Washington required to sell the fourth on his own. If he did not comply, he would lose seven stores in the rewrite window. If he acquiesced, the field office would not make any recommendations to the Rewrite Committee before Mr. Washington's next scheduled business review in December 2020.

117.   On May 6, 2019, field office vice president William Armstrong wrote: "If you do not complete the sale of the four restaurants by July 30, however, then McDonald's will immediately proceed with its recommendation to the Rewrite Committee that it deny rewrites for the seven franchises in the rewrite window (NSNs 467, 3737, 26709, 26708, 27375, 28166 and 27397)."

118.   Mr. Washington endeavored, as he had been for many months, to comply with McDonald's latest demands on the unfair terms it was unilaterally dictating to him (terms to which McDonald's would never subject a White franchisee). He spoke to all the approved buyers that McDonald's identified, but not one was interested in purchasing the stores based solely on location. Price was never even discussed.

119.    In other words, McDonald's pigeonholed Mr. Washington into low-volume stores in distressed neighborhoods, and then blamed him when no one wanted to buy them.

120.    A few weeks before its latest deadline to sell, McDonald's notified Mr. Washington that John House, a White franchisee, would purchase the Kinsman, Buckeye, and Beacon Place stores for $380,000. At McDonald's insistence, Mr. Washington was forced to sell the Kinsman store—one of the four stores boycotted in 1969—back to a White owner. And Mr. Washington was still required to sell the Euclid Avenue store with no assistance. McDonald's demanded that these transactions be completed by September 30, 2019.

121.    Meanwhile, Susan Montgomery, the franchise business partner assigned to Mr. Washington through the field office, began reaching out to Mr. Washington in August 2019 about scheduling his next business review (which it had agreed not to conduct until late 2020 if he complied with the demands to sell by September 30, 2019). This further made clear to Mr. Washington that McDonald's had no intention of abiding by its agreement, but he had no choice but to continue the mandated downsizing because of the unequal power dynamic McDonald's enjoys in the franchisor-franchisee relationship.

122.    Mr. Washington sold the three stores to Mr. House by McDonald's deadline, but remained unable to locate a buyer for the Euclid Avenue store.

123.    McDonald's offered Mr. House extensive incentives—$3 million according to McDonald's—to purchase the three Cleveland stores. But it never offered those kinds

of incentives or financial support to Mr. Washington to allow him to succeed in those substandard locations. To this day, McDonald's remains willing to support White franchisees in ways that it refuses to support Black franchisees.

124. When Mr. Washington was unable to sell the Euclid Avenue store by McDonald's deadline, it gave him an ultimatum to sell it within two weeks or lose seven additional stores. Mr. Armstrong delivered that threat on McDonald's behalf on October 2, 2019. McDonald's did not make such threats to White franchisees.

125. Mr. Washington remained unable to secure a buyer. On October 21, 2019, after Mr. Washington had jumped through one hoop after another (sold four stores, then three stores, and done his best to sell the Euclid store)—Mr. Armstrong, on behalf of McDonald's Columbus field office, recommended to the Rewrite Committee that Mr. Washington be denied rewrite on the stores in the rewrite window. There were six stores impacted by this recommendation, given that he had recently sold one of the stores (Kinsman) in the window.

126. Mr. Washington wrote to the Rewrite Committee on November 14, 2019, to request a new business review before the Committee decided his fate. He explained that his organization had not been assessed since 2017 and those data were skewed by the negative impact of the low-volume stores in increasingly distressed areas on Cleveland's East Side. The data were also skewed by the subjective metrics designed to allow for negative grading of franchisees like Mr. Washington whom the company wants to force out, consistent with the longstanding policies of discrimination that the Easterbrook-Kempczinski regime continued as a means of pushing Black

franchisees out of McDonald's system. Mr. Washington submitted extensive information demonstrating his organization's compliance with the governing standards and requirements and identified problems with the field office's approach to assessing his stores.

127. The very next day, the Rewrite Committee rubberstamped the field office's recommendation and denied Mr. Washington rewrite on six franchises. The Committee insisted on proceeding with the inaccurate, skewed, subjective, two-year-old data the field office provided. The Committee could not possibly have carefully reviewed all of the information Mr. Washington submitted in that single day. The rewrite denial was a foregone conclusion from the moment the field office sent its recommendation to the Committee. Despite his extended efforts to appease and comply with McDonald's shifting demands, McDonald's opted to further decimate his organization.

128. On information and belief, the Rewrite Committee has never denied rewrite to a White franchisee based on clearly outdated information or without carefully considering the information the franchisee provided.

129. On November 22, 2019, McDonald's warned Mr. Washington to promptly sell the six stores on which it denied rewrite. McDonald's made clear that it was his responsibility to find a purchaser whom McDonald's would approve. McDonald's warned that Mr. Washington would "have nothing to sell" if he did not complete the sales before the franchise terms expired.

130. McDonald's also retaliated against Mr. Washington because he complained about race discrimination by categorically denying his son the opportunity to become a franchisee. Mr. Washington's son completed the process to become a McDonald's franchisee through the NextGen Training Program. But once McDonald's branded Mr. Washington ineligible for growth and rewrite, McDonald's deemed his son ineligible to purchase *any* stores (Mr. Washington's or anyone else's). Punishing Mr. Washington's son for Mr. Washington's opposition to McDonald's racism is retaliatory and interferes with the transfer of intergenerational wealth in the Black community.

131. McDonald's campaign to drive Mr. Washington from the system continues. In response to a draft business review sent to him in early 2020, Mr. Washington identified substantial errors and serious concerns with the contents. He questioned how McDonald's manipulated his scores, noting the racialized element of McDonald's decision making. He also pointed out the unfairness of the consultant grading his stores being the son-in-law of one of the White owners most likely to benefit from further forced sales by Mr. Washington. Seeing the writing on the wall, he noted that this was "a way for black owners to leave with less money as white owners buy their restaurants McDonald's forces them to sell." He also again lodged his objection to McDonald's slashing advertising expenditures in the Black community and the obvious impact on his stores.

132. Justifiably fearful that McDonald's would continue to decimate his organization one store at a time, Mr. Washington made the reasonable request to

have legal counsel or at least a business advisor with him at his next business review. McDonald's refused.

133.    In continued retaliation for his ongoing criticism of the racist policies and practices of McDonald's and consistent with its general approach to treating Black owners less favorably than White owners, McDonald's continued to grade Mr. Washington as ineligible for growth and rewrite following his business review in early 2020. McDonald's also continued to harangue Mr. Washington to pour resources into the remodeling projects at the stores it was forcing him to sell, insisting that he move up the completion dates for two of his stores (that it was requiring him to sell) from 2021 to 2020. Such expenditures would inure to the benefit of the (inevitably White) operator whom McDonald's approves to purchase these stores at fire-sale prices. McDonald's has threatened to continue to grade Mr. Washington as ineligible for growth and rewrite (and thus at risk of losing more stores) if he does not comply with these demands. This will also continue to block Mr. Washington's son from becoming a franchisee.

134.    McDonald's also criticized Mr. Washington for not being sufficiently "positive" and "collaborative" in his interactions with the company. These criticisms are in retaliation for Mr. Washington's opposition to the race discrimination he continues to face.

135.    Beyond the extensive economic damage that McDonald's has caused Mr. Washington by its continuing race-based discrimination against him, he has sustained incalculable injury to his dignity. Mr. Washington has had to devote

substantial time, energy, effort, and resources to dealing with McDonald's ever-shifting expectations and demands and responding to unfair and unjustified criticism. He has had to suffer the anxiety of watching a powerful corporation steadily dismantle his life's work. Devoting time to urgently striving to meet McDonald's ever-shifting demands took time away from Mr. Washington's ability to run his stores, resulting in decreased cash flow and business value.

136. McDonald's does not treat White franchisees the way it has treated Mr. Washington. White franchisees are not pigeonholed into substandard locations and then penalized for the inevitable low performance inherent in underperforming stores. Nor are they driven out of the system after decades of profitable service to the company.

137. When Mr. Covelli breached his franchise agreement by entering a competing business (Panera Bread), McDonald's facilitated an agreeable exit on his terms and did not raise a finger when he poached Mr. Washington's employees. McDonald's refused to give Mr. Washington the type of financial and other relief that it generally makes available to White owners and did nothing as Mr. Covelli damaged the business he had just sold to Mr. Washington.

138. Mr. Washington was injured and continues to be injured by McDonald's discriminatory race-based practices in terms of lower cash flow and decreased equity in his existing stores, in addition to diminished returns on his investments in the stores he has been forced to relinquish. McDonald's refusal to permit him to purchase stores in predominantly White communities—most recently University Heights and

Wooster—is further proof that its longstanding racial-steering practices persist. McDonald's sets Black franchisees up to fail and then profits from their demise, redistributing their wealth to White franchisees.

139.    But for Mr. Washington's race and/or opposition to race discrimination, McDonald's would not have steered him into unequal franchising opportunities compared to his White counterparts; artificially capped his growth opportunities and profits; required him to incur disproportionately high operational costs and low sales volume; engaged in disparate resource allocation (temporary and permanent rent relief, impact relief, advertising, or assistance with mandated initiatives); subjected him to rigged and unfair assessments; blamed him for problems at stores that predated his ownership and no owner could remedy without substantial support from McDonald's; targeted him for extinction as a franchisee; or otherwise denied Mr. Washington the same opportunities and treatment that White franchisees enjoy, including as to the creation, performance, and maintenance of their contracts. As detailed above, White franchisees like Mr. Locke, Mr. House, and Mr. Stiles have benefitted and continue to benefit from McDonald's persistent and intentional policies of race discrimination against Black franchisees, including Mr. Washington— all to the detriment of Mr. Washington and other Black franchisees.

### CLAIM 1: 42 U.S.C. § 1981
### RACE DISCRIMINATION IN CONTRACTING

140.    Plaintiff incorporates all allegations of this complaint.

141.    As detailed above, McDonald's has consistently violated Mr. Washington's right to equal treatment in making and enforcing contracts, including enjoying all

benefits, privileges, terms, and conditions of the contractual relationship under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981(a) and 1981(b), as amended in 1991. McDonald's consistently privileged White franchisees over Black franchisees, including in the ways described above.

142.   Each day that Mr. Washington operates the stores that McDonald's approved him to purchase, under the disparate conditions it dictates, he continues to be injured by McDonald's longstanding and demonstrable history of disparate treatment of Black franchisees described above. Had McDonald's ceased these wrongful practices as promised, at least some of Mr. Washington's injuries could have been avoided.

143.   But for Mr. Washington's race, he would not have experienced the disparate treatment to which McDonald's has subjected him.

144.   As a direct and proximate result of McDonald's illegal, intentional, and persistent race discrimination against Mr. Washington as a Black franchisee, Mr. Washington has suffered and continues to suffer substantial economic and non-economic damages.

145.   McDonald's acts were intentional, malicious, and demonstrate reckless indifference to Mr. Washington's rights. He is entitled to recover punitive damages.

## CLAIM 2: 42 U.S.C. § 1981
### RETALIATION FOR OPPOSING RACE DISCRIMINATION IN CONTRACTING

146.   Plaintiff incorporates all allegations of this complaint.

147.   As detailed above, Plaintiff complained about race discrimination in contracting and was retaliated against because of his opposition to discrimination.

148.   But for Mr. Washington's opposition to race discrimination, he would not have experienced the retaliation to which McDonald's has subjected him.

149.   As a direct and proximate result of his opposition to discrimination in contracting, he has suffered and continues to suffer economic and non-economic damages.

150.   McDonald's acts were intentional, malicious, and demonstrate reckless indifference to Mr. Washington's rights. He is entitled to recover punitive damages.

## CLAIM 3: 42 U.S.C. § 1982
### RACE DISCRIMINATION IN SALE OR LEASE OF PROPERTY

151.   Plaintiff incorporates all allegations of this complaint.

152.   As detailed above, McDonald's racially motivated decisions interfered with Mr. Washington's property rights on the basis of his race.

153.   As detailed above, McDonald's has consistently violated Mr. Washington's right to equal treatment in the sale and lease of property under the Civil Rights Act of 1866, 42 U.S.C. § 1982. McDonald's consistently privileged White franchisees over Black franchisees, including in the ways described above.

154.   Each day that Mr. Washington operates the stores that McDonald's approved him to purchase, under the disparate conditions it dictates, he continues to be injured by McDonald's disparate treatment of Black franchisees described above. Had McDonald's ceased these wrongful practices as promised, at least some of Mr. Washington's injuries could have been avoided.

155.   But for Mr. Washington's race, he would not have experienced the disparate treatment to which McDonald's has subjected him.

156.   As a direct and proximate result of McDonald's illegal, intentional, and persistent race discrimination against Mr. Washington as a Black franchisee, Mr. Washington has suffered and continues to suffer substantial economic and non-economic damages.

157.   McDonald's acts were intentional, malicious, and demonstrate reckless indifference to Mr. Washington's rights. He is entitled to recover punitive damages.

## CLAIM 4: 42 U.S.C. § 1982
### RETALIATION FOR OPPOSING RACE DISCRIMINATION IN SALE OR LEASE OF PROPERTY

158.   Plaintiff incorporates all allegations of this complaint.

159.   As detailed above, Plaintiff complained about race discrimination in the sale and lease of property and was retaliated against because of his opposition to discrimination.

160.   But for Mr. Washington's opposition to race discrimination in the sale and lease of property, he would not have experienced the retaliation to which McDonald's has subjected him.

161.   As a direct and proximate result of his opposition to discrimination, Mr. Washington has suffered and continues to suffer economic and non-economic damages.

162.   McDonald's acts were intentional, malicious, and demonstrate reckless indifference to Mr. Washington's rights. He is entitled to recover punitive damages.

## CLAIM 5: BREACH OF CONTRACT

163.   Plaintiff incorporates all allegations of this complaint.

164.  Mr. Washington and McDonald's entered many contracts over the past 40 years, an example of which is attached as Exhibit 1. Mr. Washington substantially performed his obligations under each of those franchise agreements.

165.  In various franchise agreements with Mr. Washington, McDonald's promised to "make available to [Mr. Washington] all additional services, facilities, rights, and privileges relating to the operation of the Restaurant which McDonald's makes generally available, from time to time, to all its franchisees operating McDonald's restaurants." McDonald's violated this provision with respect to Mr. Washington.

166.  McDonald's repeatedly breached its contractual obligations to Mr. Washington by making the promised benefits of the franchise agreements *un*equally available based on the race of the franchisee, giving preferential treatment to White franchisees to Mr. Washington's detriment.

167.  McDonald's repeatedly breached its contractual obligations to Mr. Washington by acting in bad faith to force the sale of multiple stores to White owners.

168.  As a direct and proximate result of McDonald's breach of its contracts with Mr. Washington, he has suffered and continues to suffer damages.

### CLAIM 6: UNJUST ENRICHMENT

169.  Plaintiff incorporates all allegations of this complaint.

170.  Through the conduct described above, McDonald's has unjustly enriched itself and its White franchisees at Mr. Washington's expense.

171.  As a direct and proximate result of its disparate treatment of Mr. Washington as compared with White franchisees, as well as its efforts to reduce his organization's

size and profitability due to his race and/or his opposition to discrimination, McDonald's has unjustly retained benefits to Mr. Washington's detriment.

172. Allowing McDonald's to retain benefits obtained through invidious and unlawful race discrimination violates the fundamental principles of justice, equity, and good conscience. These ill-gotten gains must, in fairness, be disgorged and returned to Mr. Washington.

### PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

- Declare that Defendants' acts and conduct violate federal law;

- Enter judgment in Plaintiff's favor on all claims for relief;

- Award Plaintiff full compensatory damages, economic and non-economic, including, but not limited to, damages for pain, suffering, mental anguish, emotional distress, humiliation, and inconvenience that he has suffered and is reasonably certain to suffer in the future;

- Award Plaintiff equitable remedies including injunctive relief and disgorgement and restitution for Defendants' inequitable conduct;

- Award Plaintiff his reasonable attorneys' fees and all other costs of this suit under 42 U.S.C. § 1988;

- Award pre- and post-judgment interest at the highest lawful rate;

- Award all other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just, or proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues within this complaint.

Respectfully submitted,

*s/ Joseph C. Peiffer*

Joseph C. Peiffer
Kevin P. Conway (*pro hac vice to be filed*)
David M. Abdullah (*pro hac vice to be filed*)
**PEIFFER WOLF CARR KANE & CONWAY, LLP**
1519 Robert C. Blakes Sr. Drive
New Orleans, Louisiana 70130
(504) 523-2434 (p) / (504) 608-1465 (f)
jpeiffer@peifferwolf.com
kconway@peifferwolf.com
dabdullah@peifferwolf.com

Ashlie Case Sletvold (OH 0079477)
**PEIFFER WOLF CARR KANE & CONWAY, LLP**
1422 Euclid Avenue, Suite 1610
Cleveland, Ohio 44115
(216) 260-0808 (p) / (504) 608-1465 (f)
asletvold@peifferwolf.com